JMK/DK/CJC:WK/MEB/DE
F. #2018R01000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

HECTOR NUÑEZ TROYANO,

      Defendant.

- - - - - - - - - - - - - - - - X

19-M-159

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT_____

(T. 18, U.S.C., § 1956)

EASTERN DISTRICT OF NEW YORK, SS:

    PATRICK KILLEEN, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

    Upon information and belief, in or about and between 2011 and 2018, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant HECTOR NUÑEZ TROYANO, together with others, did knowingly and intentionally

conspire to commit offenses against the United States, to wit: to transport, transmit and transfer

monetary instruments and funds from a place in the United States to and through a place outside

the United States and to a place in the United States from and through a place outside the United

States with the intent to promote the carrying on of one or more specified unlawful activities, to

wit, felony violations of the Foreign Corrupt Practices Act, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     I have been a Special Agent with FBI for approximately 16 years. During my career as a federal law enforcement officer, I have personally participated in numerous investigations, the execution of numerous search and arrest warrants, and the debriefing of cooperating witnesses and informants, all related to various types of financial crime, fraud, and corruption. Among other federal crimes, I have investigated offenses involving conspiracies, public corruption, bank fraud and money laundering, as well as violations of the Foreign Corrupt Practices Act ("FCPA").

2.     In addition to my training and experience, I am familiar with the information contained in this complaint and affidavit based upon, among other sources of evidence: (i) my own personal participation in the investigation, (ii) my review of documents, records and reports, (iii) interviews of witnesses, and (iv) discussions with other law enforcement personnel.

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, where I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.

I.     BACKGROUND

A.     The Foreign Corrupt Practices Act Generally

3.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

B.     Entities and Individuals

4.     Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for exploration, production, refining, transportation and trade in energy resources in Venezuela. Among other products, PDVSA supplied asphalt to companies around the world and also provided funding for various operations of the Venezuelan government. PDVSA and its wholly owned subsidiaries were "instrumentalities" of the Venezuelan government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A). PDVSA officers and employees were "foreign officials," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

5.     Asphalt Company was a company incorporated and based in the United States that stored, transported and traded asphalt.[2] Asphalt Company was one of the largest asphalt providers in the world. Asphalt Company was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

---

[2] Certain entities' and individuals' names have been anonymized for the purposes of this criminal complaint. Specifically, these are: Asphalt Company, Asphalt Trading, Asphalt Company Affiliate, Joint Venture Co., Swiss Asphalt Company, Asphalt Company Two, Asphalt Company Employee, Asphalt Trading Employee, Consultant and PSVSA Official #1. The identity of each of these entities and individuals is known to me.

3

6.     Asphalt Trading was a company incorporated in the Bahamas and based in the United States that was one of a group of companies related to Asphalt Company. Asphalt Trading provided asphalt-related services to customers. Asphalt Trading's principal place of business was in the same location as Asphalt Company's principal place of business in the United States. Asphalt Trading was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.     Asphalt Company Affiliate was a company incorporated in Switzerland that was one of a group of companies related to Asphalt Company. Asphalt Company Affiliate had the same principals as Asphalt Trading and was incorporated after lending institutions withheld lines of credit from Asphalt Trading in or around 2012.

8.     Joint Venture Co. was an asphalt trading joint venture between Asphalt Company and a European asphalt company.

9.     Swiss Asphalt Company was a company incorporated in Switzerland that was in the asphalt business and, at times, a competitor to Asphalt Company. In or about and between 2012 and 2015, Asphalt Trading entered into various contracts with Swiss Asphalt Company to purchase asphalt.

10.    Asphalt Company Two was a company headquartered in Puerto Rico that was in the asphalt business. It operated primarily in Latin America and the Caribbean. Asphalt Company Two was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

11.    The defendant HECTOR NUÑEZ TROYANO was a dual citizen of Spain and Venezuela, was an employee at PDVSA in or about and between 2011 and March 2015 and

4

was involved in the sale of PDVSA asphalt. TROYANO was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

12.     Asphalt Company Employee was a citizen of Venezuela and legal permanent resident of the United States since at least 2017. Asphalt Company Employee was a trader at Asphalt Company in or about and between 2012 and 2018. Asphalt Company Employee's responsibilities included seeking contracts for Asphalt Company, Asphalt Trading and related companies with PDVSA. Asphalt Company Employee was an employee of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

13.     Asphalt Trading Employee was a citizen of the United States who worked in the United States for Asphalt Company and related companies from approximately 2006 through 2018. Asphalt Trading Employee's responsibilities included seeking contracts for Asphalt Company, Asphalt Trading and related companies with Petrobras and PDVSA. Asphalt Trading Employee was a "domestic concern," an employee of a "domestic concern" and an agent ' of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

14.     Consultant was a citizen of Venezuela and a naturalized U.S. citizen as of approximately 2014 who worked at various times as an agent for Asphalt Company, Asphalt Trading, Asphalt Company Affiliate, Joint Venture Co. and Asphalt Company Two. Consultant was a "domestic concern" and an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

15.     PDVSA Official #1, a citizen of Venezuela and a manager at PDVSA in or about and between 2011 and 2015, was a supervisor of the defendant HECTOR NUÑEZ

5

TROYANO at PDVSA. During that time, PDVSA Official #1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

## II.   THE CONSPIRACY

16.     Based upon information provided by three cooperating witnesses involved in the bribery scheme,[3] a review of bank records, WhatsApp and e-mail communications obtained from a variety of sources and involving the defendant HECTOR NUÑEZ TROYANO, and a review of contracts, agreements and other documents, I have learned that beginning in or about 2011 until 2018, TROYANO agreed with PDVSA Official #1 and Consultant to a scheme in which TROYANO, PDVSA Official #1 and other PDVSA officials would solicit and accept bribes, facilitated by Consultant, from multiple companies, including Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and Asphalt Company Two, in order to assist those companies in obtaining contracts to purchase asphalt from PDVSA. Specifically, based upon the information and evidence itemized above, I have learned the following:

A.     The Asphalt Company Two Bribery Scheme

17.     In or about 2011, Consultant, who was an agent of Asphalt Company Two, agreed with the principal of that company to pay bribes to the defendant HECTOR NUÑEZ TROYANO and PDVSA Official #1 in order to assist Asphalt Company Two in winning term contracts to purchase asphalt from PDVSA.

---

[3] Your affiant knows the identity of the three cooperating witnesses referred to in text. These witnesses each pled guilty to conspiracy to violate the FCPA pursuant to written cooperation agreements with the government, and are cooperating in the hope of receiving a more lenient sentence in connection with their cases. The information provided by these three cooperating witnesses has been corroborated by a review of bank records, e-mail and other messaging communications gathered during the investigation, and by information provided by other witnesses interviewed during the investigation.

6

18.     Pursuant to this agreement, between approximately 2011 and 2015,

Asphalt Company Two paid Consultant a commission of approximately 45 cents for every barrel

of asphalt that Asphalt Company Two purchased from PDVSA. Consultant in turn passed a

portion of these commission payments to the defendant HECTOR NUÑEZ TROYANO as

bribes, with the expectation that TROYANO would share some of the bribes with PDVSA

Official #1. In order to disguise the bribe payments, TROYANO and PDVSA Official #1

directed Consultant to transfer money to various bank accounts, including to bank accounts in

Panama in the names of shell companies controlled by TROYANO.

B.     The Asphalt Company Group Bribery Scheme

19.     Following a dispute between PDVSA and Asphalt Company prior to 2012,

PDVSA refused to sell asphalt to Asphalt Company or companies related to Asphalt Company.

In order to circumvent this prohibition, Asphalt Company and Swiss Asphalt Company agreed

that Swiss Asphalt Company would purchase asphalt from PDVSA at the request and direction

of Asphalt Company and then resell that asphalt to Asphalt Company at a small premium. At

this same time, in or about 2012, and continuing to in or about 2015, the defendant HECTOR

NUÑEZ TROYANO and PDVSA Official #1 agreed with Consultant, Asphalt Company

Employee, Asphalt Trading Employee and an executive at those companies that Consultant

would pay bribes to TROYANO and PDVSA Official #1 on behalf of Asphalt Company,

Asphalt Trading and Asphalt Company Affiliate in exchange for their assistance in obtaining and

retaining term contracts for Swiss Asphalt Company with PDVSA to purchase asphalt in order

for Asphalt Company, Asphalt Trading and Asphalt Company Affiliate to then purchase the

asphalt from Swiss Asphalt Company.

20.     As a part of this arrangement, from approximately 2012 to 2015, Asphalt
Company and Asphalt Company Affiliate paid Consultant a commission of approximately 45
cents for every barrel of asphalt that Swiss Asphalt Company purchased from PDVSA and
provided to Asphalt Company. Consultant, in turn, paid a bribe to the defendant HECTOR
NUÑEZ TROYANO for each barrel of asphalt PDVSA sold to Swiss Asphalt Company.
TROYANO shared a portion of his bribe payments with PDVSA Official #1, and Consultant
also separately agreed with Asphalt Company Employee to pay Asphalt Company Employee a
kickback of five cents for each barrel of asphalt that PDVSA sold to Swiss Asphalt Company.

C.     Bribe Payments to Shell Accounts to Promote and Conceal the Scheme

21.     Collectively, in or about and between July 2013 and October 2015,
Consultant wired approximately $500,000 in payments on behalf of Asphalt Company, Asphalt
Trading, Asphalt Company Affiliate and Asphalt Company Two from accounts that Consultant
controlled in the United States and Panama to Panamanian bank accounts for a shell company
that were controlled by the defendant HECTOR NUÑEZ TROYANO in order to promote the
bribery scheme.

22.     With respect to Asphalt Company, Asphalt Trading and Asphalt Company
Affiliate, the corrupt payments permitted them to purchase approximately 2.6 million barrels of
asphalt from PDVSA.

D.     Continuation of the Scheme after TROYANO Left PDVSA

23.     In approximately March 2015, the defendant HECTOR NUÑEZ
TROYANO stopped working at PDVSA, but he continued to participate in the scheme. In or
about and between mid-2015 and April 2018, TROYANO, Consultant, Asphalt Company
Employee, Asphalt Trading Employee and a high-ranking executive at those companies

8

continued to pay, and caused payments to be made to, TROYANO who would in turn pay bribes to others at PDVSA in exchange for supplying TROYANO with inside, non-public information, and for expediting the payment of certain late fees, called demurrage fees, owed by PDVSA to Swiss Asphalt Company. TROYANO in turn continued to provide this inside, non-public information to Asphalt Company and Asphalt Company Affiliate, through Consultant, to give them a competitive advantage in the international purchase and sale of asphalt.

24. With the approval of Asphalt Company executives, and in order to fund and disguise the bribe payments paid by Consultant through the defendant HECTOR NUÑEZ TROYANO, Consultant entered into a sham consulting agreement with Joint Venture Co. pursuant to which Consultant purportedly received a $2,000 monthly retainer. Consultant in turn made payments to TROYANO so that he could bribe PDVSA officials in furtherance of the scheme.

E.    Additional Acts in Furtherance of the Conspiracy

25. In furtherance of the conspiracy and to conceal his identity, the defendant HECTOR NUÑEZ TROYANO often used the codename "Oiltrader" when communicating with his co-conspirators. TROYANO took various other acts in furtherance of the conspiracy including, among other things, communicating via e-mail and WhatsApp with Consultant, attaching confidential PDVSA information to e-mails he sent to Consultant and directing Consultant to wire money to bank accounts he controlled. For example:

(a)    On or about August 18, 2014, TROYANO forwarded an e-mail to Consultant attaching an internal PDVSA e-mail assessing the demurrage fees it owed in connection with various shipments.

9

(b)     On or about July 22, 2017, TROYANO sent Consultant an e-mail with the subject line "chocolates agosto 17," attaching an internal PDVSA document containing confidential information titled "CHOCOLATES 0807.xls."

(c)     On or about March 28, 2018, while in the Eastern District of New York, Consultant wired a $3,000 payment from an account Consultant controlled at a TD Bank located in the Eastern District of New York, to an account controlled by TROYANO in Panama.

III.     CONCLUSION

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant HECTOR NUÑEZ TROYANO so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

PATRICK KILLEEN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20 th day of February, 2019

THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

10