WK/CC:DE/MEB/JR
F. #2018R01000

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 15 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against –<br><br>HECTOR NUÑEZ TROYANO,<br><br>Defendant. | I N F O R M A T I O N<br><br>Cr. No. <u>19-135</u> (ENV)<br>(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1), 1956(h) and 3551 <u>et seq.</u>; T. 21, U.S.C., § 853(p)) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

I.  <u>The Defendant and Relevant Entities</u>

1. Petroleos de Venezuela S.A. ("PDVSA") was a Venezuelan state-owned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for exploration, production, refining, transportation and trade in energy resources in Venezuela. Among other products, PDVSA supplied asphalt to companies around the world and also provided funding for various operations of the Venezuelan government. PDVSA and its wholly-owned subsidiaries were "instrumentalities" of the Venezuelan government, as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A). PDVSA officers and employees were "foreign officials," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

2. Asphalt Company, the identity of which is known to the United States, was a company incorporated and based in the United States that stored, transported and traded

asphalt. Asphalt Company was one of the largest asphalt providers in the world. Asphalt Company was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3. Asphalt Trading, the identity of which is known to the United States, was a company incorporated in the Bahamas and based in the United States that was one of a group of companies related to Asphalt Company. Asphalt Trading's principal place of business was in the same location as Asphalt Company's principal place of business in the United States. Asphalt Trading was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

4. Asphalt Company Affiliate, the identity of which is known to the United States, was a company incorporated in Switzerland that was one of a group of companies related to Asphalt Company. Asphalt Company Affiliate had the same principals as Asphalt Trading and was incorporated after lending institutions withheld lines of credit from Asphalt Trading in or around 2012.

5. Joint Venture Co., the identity of which is known to the United States, was an asphalt trading joint venture between Asphalt Company and a European asphalt company.

6. Swiss Asphalt Company, the identity of which is known to the United States, was a company incorporated in Switzerland that was in the asphalt business and, at times, was a competitor to Asphalt Company. In or about and between 2012 and 2015, Asphalt Trading entered into various contracts with Swiss Asphalt Company to purchase asphalt.

7. Asphalt Company Two, the identity of which is known to the United States, was a company headquartered in Puerto Rico that was in the asphalt business. It operated

3

primarily in Latin America and the Caribbean. Asphalt Company Two was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8. The defendant HECTOR NUÑEZ TROYANO was a dual citizen of Spain and Venezuela, was an employee at PDVSA in or about and between 2008 and February 2015, and was involved in the sale of PDVSA asphalt. During that time, TROYANO was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

9. Asphalt Company Employee, an individual whose identity is known to the United States, was a citizen of Venezuela and, since 2017 or earlier, a legal permanent resident of the United States. Asphalt Company Employee was a trader at Asphalt Company in or about and between 2012 and 2018. Asphalt Company Employee's responsibilities included seeking contracts with PDVSA for Asphalt Company, Asphalt Trading and related companies. Asphalt Company Employee was an employee of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

10. Asphalt Trading Employee, an individual whose identity is known to the United States, was a citizen of the United States who worked in the United States for Asphalt Company and related companies in or about and between 2006 and 2017. Asphalt Trading Employee's responsibilities included seeking contracts with PDVSA for Asphalt Company, Asphalt Trading and related companies. Asphalt Trading Employee was a "domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

11. Consultant, an individual whose identity is known to the United States, was a citizen of Venezuela and, as of approximately 2014, a naturalized U.S. citizen. Consultant worked at various times as an agent for Asphalt Company, Asphalt Trading, Asphalt Company Affiliate, Joint Venture Co. and Asphalt Company Two. Consultant was a "domestic concern" and an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

12. PDVSA Official #1, an individual whose identity is known to the United States, was a citizen of Venezuela and a supervisor of the defendant HECTOR NUÑEZ TROYANO at PDVSA in or about and between 2011 and 2013. During that time, PDVSA Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

II. The Bribery and Money Laundering Scheme

13. In or about and between 2011 and 2018, the defendant HECTOR NUNEZ TROYANO agreed with PDVSA Official #1, Consultant and others to participate in a scheme in which TROYANO, PDVSA Official #1 and other PDVSA officials would receive bribes, facilitated by Consultant, from multiple companies, including Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and Asphalt Company Two, in order to assist those companies in obtaining contracts to purchase asphalt from PDVSA.

A. Bribes from Asphalt Company Two

14. In or about 2011, Consultant, the principal of Asphalt Company Two and others agreed to pay bribes to the defendant HECTOR NUÑEZ TROYANO and PDVSA

Official #1 to assist Asphalt Company Two in winning term contracts to purchase asphalt from PDVSA.

15. Between approximately 2011 and 2015, Asphalt Company Two paid Consultant a commission of approximately 45 cents for every barrel of asphalt that Asphalt Company Two purchased from PDVSA. Consultant in turn used a portion of those commissions to pay bribes to the defendant HECTOR NUÑEZ TROYANO, and TROYANO would share some of the bribe payments with PDVSA Official #1. To disguise the bribe payments, TROYANO and PDVSA Official #1 directed Consultant to transfer money to various bank accounts, including to bank accounts in Panama in the names of shell companies controlled by TROYANO.

B. Bribes from Asphalt Company and Related Companies

16. Following a dispute between PDVSA and Asphalt Company prior to 2012, PDVSA refused to sell asphalt to Asphalt Company and its related companies. To circumvent this prohibition, Asphalt Company and Swiss Asphalt Company agreed that Swiss Asphalt Company would purchase asphalt from PDVSA at the request and direction of Asphalt Company and then resell that asphalt to Asphalt Company at a small premium.

17. In or about and between 2012 and 2015, the defendant HECTOR NUÑEZ TROYANO agreed with others, including Consultant, Asphalt Company Employee, Asphalt Trading Employee and a high-ranking executive at Asphalt Company, that Consultant would pay bribes to TROYANO and PDVSA Official #1 on behalf of Asphalt Company, Asphalt Trading and Asphalt Company Affiliate. In exchange, TROYANO and PDVSA Official #1 agreed to assist Swiss Asphalt Company in obtaining and retaining term contracts with PDVSA to

6

purchase asphalt for resale to Asphalt Company, Asphalt Trading and Asphalt Company Affiliate.

18. As a part of this arrangement, from approximately 2012 to 2015, Asphalt Company and Asphalt Company Affiliate paid Consultant a commission of approximately 45 cents for each barrel of asphalt that Swiss Asphalt Company purchased from PDVSA and provided to Asphalt Company. Consultant in turn paid a bribe to the defendant HECTOR NUÑEZ TROYANO for each barrel of asphalt that PDVSA sold to Swiss Asphalt Company. Consultant also agreed with Asphalt Company Employee to pay Asphalt Company Employee a kickback of five cents for each barrel of asphalt that PDVSA sold to Swiss Asphalt Company.

C. Bribes for Inside Information

19. The defendant HECTOR NUÑEZ TROYANO continued to participate in the scheme following his departure from PDVSA in approximately February 2015. In or about and between March 2015 and April 2018, TROYANO agreed with Consultant, Asphalt Trading Employee, Asphalt Company Employee and a high-ranking executive at Asphalt Company that Consultant would pay $500 per month in bribes to be distributed to multiple PDVSA officials in exchange for supplying Asphalt Company and Asphalt Company Affiliate, through Consultant and at times TROYANO, with inside, non-public information to give Asphalt Company and Asphalt Company Affiliate a competitive advantage in the international purchase and sale of asphalt.

20. With the approval of a high-ranking Asphalt Company executive, and in order to fund and disguise the $500 monthly bribe payments, Consultant entered into a sham

consulting agreement with Joint Venture Co., pursuant to which Consultant purportedly received a $2,000 monthly retainer.

### D. Bribe Payments to Shell Accounts Between 2013 and 2015

21. In order to promote and conceal the bribery scheme, payments to foreign government officials and others involved in the scheme were sometimes paid to or through a shell account that was controlled by a person other than the named account holder. In or about and between approximately July 2013 and October 2015, Consultant wired a total of approximately $500,000 in such payments on behalf of Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and Asphalt Company Two. Consultant wired such payments from accounts that Consultant controlled in the United States and Panama to Panamanian bank accounts held in the name of a shell company and controlled by the defendant HECTOR NUÑEZ TROYANO.

22. With respect to Asphalt Company, Asphalt Trading and Asphalt Company Affiliate, the corrupt payments permitted them to purchase, in or about and between July 2013 and October 2015, approximately 2.6 million barrels of asphalt from PDVSA.

### CONSPIRACY TO COMMIT MONEY LAUNDERING

23. The allegations contained in paragraphs one through 22 are realleged and incorporated as if fully set forth in this paragraph.

24. In or about and between 2011 and 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HECTOR NUÑEZ TROYANO, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds from a place in the United States

8

to and through a place outside the United States and to a place in the United States from and through a place outside the United States:

(a) with the intent to promote the carrying on of specified unlawful activities, to wit: felony violations of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3 (the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

25. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

26. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

9

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

  (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))


BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

_____
RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

For _____
ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division, Dept. of Justice